**PATTON  v.  NICHOLAS et al.**

No. 4990.

Court of Civil Appeals of Texas.

El Paso.

April 28, 1954.

Rehearing Denied June 9, 1954.

Thompson & Coe, C. C. Renfro, Dallas, for appellant.

William S. Campbell, Dallas, for appellees.

FRASER, Justice.

This is an appeal from the District Court of Dallas County, Texas, 134th Judicial District, wherein the case was tried to a jury on special issues. It was a suit whereby plaintiffs, hereinafter known as "appellees" obtained a judgment against defendant, hereinafter known as "appellant", dissolving the business of Machinery Sales & Supply Company, and disregarded the corporate entity of the corporation involved.

Appellant had taken Nicholas and Parks, appellees, into his employment, and in 1940 had granted each appellee 10% of the profits of the business, which percentage he increased to 20% within the next succeeding years. At the trial there was some dispute as to whether appellant had given appellees a share in the profits or a share in the business itself, which question was answered by the jury in favor of appellees and declaring them partners. Difficulties arose between appellant and appellees, the evidence indicating that appellant was dissatisfied and critical of appellees' attention to the business. In 1944 appellant threatened to discharge Parks and was advised by Parks and Nicholas both that they were partners and could not be discharged. Conditions not improving, appellees employed attorneys and indicated their intentions of bringing the matter of their asserted partnership to a decision, and to settle all partnership troubles, if partnership there was. Negotiations between the attorneys for both sides resulted in a written settlement agreement executed August 9, 1945, providing for the creation of a corporation with assets of an agreed value of $280,000. Some cash and government bonds were transferred to the corporation and stock was issued in the proportion of 20% to each appellee and approximately 60% to appellant. The corporation was completed and business was commenced in October 1945 with the three parties as directors, appellant as president

and appellees as vice-presidents. There were two other directors. In November, 1945, appellant wrote long letters to appellees complaining of their activities and insisting on better operations from them. Appellant advised appellees that he was tearing down all partitions between the offices. This was done and on December 1, 1945, appellees resigned as vice-presidents and left the employment of the corporation, but remained as directors and retained their stock. Appellees went into business for themselves in the same line of work and did business with some of the former customers of Machinery Sales & Supply Company. In March 1951 appellees filed this suit, alleging that they were induced to effect a dissolution of their partnership and transfer money, property and assets of the partnership to the corporation and that the consideration for such had failed, and that the corporation was nothing more or less than a vehicle of fraud to effect and bring about malicious diversion, confiscation, etc., of appellees' properties and assets, and that said corporation has been a continuing fraud, and that the corporate entity should be disregarded and set aside and an accounting of all properties, moneys and assets be immediately carried out through a receivership with power to liquidate and divide the business of Machinery Sales & Supply Company, asking actual and exemplary damages and alleging mismanagement of the affairs of the corporation.

The jury in answer to special issues found that the parties were partners just before the incorporation; that appellant Patton entered into the settlement agreement with the intention of wrongfully excluding appellees Nicholas and Parks from the management, control, operation and sharing of profits in the partnership business known as Machinery Sales & Supply Company; that appellees could not have learned of appellant's wrongful intention before either March 16, 1947 or March 16, 1949; that appellant dominated and controlled the Board of Directors of the corporation from its inception to the trial so that only his wishes were carried out; that

appellant dominated and controlled said board so as to prevent the declaration of dividends; that appellant prevented the declaration of dividends for the sole purpose of preventing appellees from sharing in the profits of the corporation; that appellant dominated and controlled said board for the sole purpose of depreciating the value of the shares of stock owned by appellees; that appellant as president has been guilty of mismanagement; that appellant did not cause the value of the inventories to be written down to an amount lower than the actual values in the years 1946, '47, '48, '49 and '50; that the value of the inventory of the business of August 31, 1951 was $513,910.79; that appellees were entitled to $110,610 as damages for the wrongful acts of T. W. Patton; that appellees were also entitled to $10,000 as exemplary damages because the acts of appellant were malicious; that appellant did not pay himself a larger than reasonable salary.

In answer to appellant's motion for judgment non obstante veredicto the trial court struck out all damages and the net result of the trial court's decision was that the corporate entity should be disregarded and the business known as Machinery Sales & Supply Company should be dissolved and all of the rights, titles and interests in and to all properties and affairs of such business of every kind and character be vested in the present shareholders of Machinery Sales & Supply Company as their respective interests appear on the records of Machinery Sales & Supply Company and a receiver appointed to liquidate and divide accordingly. Appellant has appealed from this judgment and appellees have appealed from that part of the judgment denying them damages.

Appellant has presented ten points of error, which will be taken up as nearly as possible in order.

Point 1 complains of the failure of the trial court to segregate the two causes of action, alleging that appellees sued individually and on behalf of the corporation. We do not find that such is a misjoinder, as the entire controversy is interwoven and we can see no harm in trying the case as presented on appellees' petition as far as any misjoinder is concerned. This point is overruled.

Point 2 complains of the inflammatory language of the petition. We do not find any merit in this point and so overrule it.

Points 3 and 4 refer to appellant's exceptions to the petition based on the two and four year statute of limitations. The jury found adversely to appellant on these matters, and examination of the record reveals sufficient evidence for these findings, inasmuch as plaintiffs filed their suit in March 1951 after having seen a copy of a letter written by appellant to a Mr. Rheinhartsen in January 1946. Appellees testified that after reading that letter in Chicago they came home and consulted their attorney immediately and suit was promptly filed thereafter. The letter from appellant to Rheinhartsen, among other things recited as follows:

"* * * You can also believe me that I paid them plenty good money. In fact, enough that as the business was incorporated they had better than $100,000.00 worth of stock due them, although a lot of my $75,000.00 bait money to save the business went into their stock. On the other hand, and what they could not figure in advance was that the $112,000.00 worth of stock they received could be change that they left on the counter."

Appellees maintain that until that time they had not suspected or realized the intentions of appellant. These points are accordingly overruled, along with points 6, 7, 8 and 9, which apply to the same subject.

Appellant's points 5 and 10 complain of the judgment on the ground that it was not justified by any proven right of appellees to rescind the settlement agreement creating the corporation, and that the judgment of the court was not justified by alleged dissensions between the shareholders of the corporation. Appellees' theory of

the case, as nearly as can be ascertained from the briefs and the petition, is that the original partnership settlement was void because of the fraudulent intent of appellant, and that the corporation was a continuing vehicle of fraudulent intent of appellant to deprive appellees of any profit or share in the business or in the operations thereof, and was conceived in fraud, carried on by fraud, and fraudulently caused them to relinquish their original plan of litigation against and the liquidation of the partnership. Appellant has maintained that such is not the case and has filed a supplemental brief more or less joining issue on the sufficiency of the evidence to sustain the trial court's judgment. There are points and counterpoints in the briefs discussing the right of the trial court to dissolve the corporation and/or the business on the ground of dissension among the stockholders, but we do not find the judgment of the trial court affected by or reflecting this particular theory. We will therefore proceed to examine the evidence in order to ascertain if there was sufficient evidence to entitle the court to disregard the corporate entity and appoint a receiver.

■ In order to make a logical disposition of the controversy we now consider the cross-points of error alleged by appellees, and which complain of the trial court's action in denying appellees any recovery for damages. We think that the action of the trial court in disregarding the corporate entity deprives the appellees of any claim for damages, as he is in effect forced into an election between standing on the agreement and asking for damages, or voiding the agreement and disregarding the corporate entity and asking a return of the property. We therefore hold that the trial court was correct in its action in disallowing any damages to appellees.

■ Now it must be borne in mind that the jury findings held in effect that appellant dominated and controlled the corporation through its board of directors, and did so in order to prevent the declaration of dividends, and to prevent appellees from sharing any profits, and for the further purpose of depreciating the value of the shares of stock owned by appellees. It is of course elementary that all presumptions supporting a judgment must be indulged. We now pass to the examination of the evidence to ascertain whether or not there was sufficient to justify the jury's finding.

■ First, we must again direct our attention to the Rheinhartsen letter, which appellees assert was the first notice they had that the alleged fraud was being carried on by the appellant using the corporation as the vehicle thereof. Appellees allege and assert that the contents of that letter indicated that appellant had the concealed fraudulent intention locked away in his mind during the settlement and incorporation, and that such was not revealed until his acts and the acts of the corporation dominated by him were studied in the shadow of the Rheinhartsen letter—in other words, appellees maintain that the Rheinhartsen letter explains the actions of appellant and exposes his concealed, fraudulent intention. We must now examine as briefly as is possible the evidence and exhibits introduced in the trial, to determine if the jury had reason for their findings. Before considering the evidence it might be well to include the following quotation:

"From its very nature fraud is difficult to prove, and sometimes it is impossible to prove it by direct and positive evidence. For that reason a wide latitude is permitted in the introduction of evidence. Its existence is frequently inferrable from circumstances and presumptions. * * *" Squyres v. Christian, Tex.Civ.App., 242 S.W.2d 786, 791.

From the first we are met with the fact that this business, according to the audits, paid dividends; in 1942 of $142,243.03; that it showed a distribution of total profits in 1944 of $148,531.06; that it showed net profit from operations from 1941 through and including 1946 of all the way from $106,554.40 to $170,999.16, but from the incorporation in 1945 through 1949 the net profit from operations was shown by the same auditor as ranging from $315.79

to $43,278.46. At the same time it must be noted that the net sales during those years were all well over a million dollars per year with the exception of 1941, when they totalled $694,882.72, as compared with net sales during the corporation years which ranged from a low of $1,033,984.56 to $1,245,597.32, so it is clear that there was a very pronounced difference in the net income, while the net sales did not vary in the same proportion. It is clear from the audit that for some reason, while the sales remained at about the same level, the profits declined during the corporate years, and of course it is in the record of the case that the corporation has never paid any dividends to appellees since its incorporation in 1945. Further examination of this audit reveals these comparisons: That in 1945, which year the business was a partnership until its incorporation in October, showed net sales of $1,093,066, with a net profit of $105,564.40. In 1950, when the business was run entirely by the corporation, about the same sales were shown, to-wit, $1,060,033, and yet the net profit shown by the audit for that year was $7,-927.04. Now further examining the audit, we find an item called "operating expenses" and they range from $34,458.99 in 1941 to $98,215.23 in 1945, the last year of the partnership. Now this same audit shows that under the corporation this same business doing about the same amount of sales, showed operating expenses beginning in 1946 of $177,451.38 to a high of $220,793.-66 in 1951, the last, of course, being corporate years. We find another item described by the auditor as "Ratio to net Sales" under the heading "Net Profit from Operation." Now these figures show ratio to net sales ranging from 9.75% in 1945 to a high of 17.93% in 1941, the lowest net ratio shown being in 1943, which figure was 8.76%. Now in the years shown, 1946, '47, '48 and '49, which of course are corporate managed years, the same item shows the ratio varying from a low of .03% in 1949 to a high of 4.36% in 1946. During these same years the ratio to net sales under the heading "Operating Expenses" ranged from a low of 4.00% in 1942 to a high of 10.41% in 1944, whereas in the corporate controlled years the ratio to net sales under operating expenses ranges from 18.-15% in 1947 to 22.22% in 1949. These figures are all taken from the audit of the auditor appointed by the court. One other item is revealed from Mr. White's audit, that is the net incomes of the appellees as partners, which range from $11,784.29 in 1941 to a high of $38,922.42 in 1943, including a figure of $20,795.67 in 1944, and yet these same individuals have realized nothing since the incorporation of the business in October 1945, excepting $2,000 salary during the two months they were vice-presidents. These facts, taken in conjunction with the Rheinhartsen letter would seem to be sufficient evidence for the jury to reach the conclusion they did. It must be also noticed that according to the audit the entire surplus earned by the corporation doing over a million dollars worth of business a year was reported in August 1951 as only $130,466.43. This would seem to be the entire surplus earned by the business during these corporate years. Lastly, it must be noted that the corporation showed only $7,927.44 net profit income in 1950, whereas in 1951 it showed a net profit income of $144,654.38, at the same time; although the sales had increased from $1,-060,033.34 in 1950 to $1,672,731.75 in 1951, the inventory had increased from $294,-813.72 to $513,910.79. It was not made clear why, while the sales increased about sixty per cent from 1950 to 1951, yet the profit on that was literally more than eighteen times as much, and the inventory had increased instead of diminishing under the volume of sales. Plaintiffs filed their petition March 16, 1951, and the audit was then ordered by the court.

Further, there is testimony of witness Earl Whitlock, who said that appellant stated to the effect that

> "As long as Nicholas and Parks were stockholders in that company there would never be a dividend paid;"

and that Patton instructed him to try to buy Parks' stock at "50% on the dollar", and Mr. Burton testified that Patton told him

"I will see that those *to* S. B.'s don't make a penny out of this business as long as I have anything to do with it."

Appellees also testified and introduced exhibits to effect that appellant promptly began to criticize them as soon as the corporation was formed, and that he committed acts of a nature that made it impossible for them to work with him and remain active in the corporation, such as the tearing down of partitions in their offices, against their express wishes, the result being that although appellees were vice-presidents and directors they no longer had private offices; also it is clear from the evidence that appellees were never, after their resignation, elected as directors, although they owned some 38% of the stock. They also testified that they were never consulted about the partnership business and received no cooperation in examining the affairs of the corporation. Their position seems to be that the realization that appellant had in his mind the using of the corporation as a vehicle of fraud did not come to them until they saw the implications and the import of the letter from appellant to Rheinhartsen.

 It seems therefore clear to us that there was evidence sufficient to sustain the jury's findings. With regard to the court's action in disregarding the corporate entity, we think that the trial court was within his power and authority to do so, as well as to order the liquidation of the business. Hammond v. Hammond, Tex.Civ.App., 216 S.W.2d 630 and cases cited therein; 18 C.J.S., Corporations, § 7; 10 Tex.Jur. § 49; 13 Am.Jur. § 7; Miner v. Belle Isle Ice Co., 93 Mich. 97, 53 N.W. 218, 17 L.R.A. 412; In re Rieger, Kapner & Altmark, D.C., 157 F. 609; McCaskill Co. v. U. S., 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590, 596; Berkshire Petroleum Corp. v. Moore, Tex.Civ.App., 268 S.W. 484; Prairie Lea Production Co. v. Tiller, Tex.Civ. App., 286 S.W. 638.

In the case of Tower Hill-Connellsville Coke Co. of West Virginia v. Piedmont Coal Co., 4 Cir., 64 F.2d 817, 827, 91 A.L.R. 648, the court states:

"The remedy given by the statute is not an exclusive one and does not prevent a federal court of equity from entering a decree which, while it winds up the affairs of the company, does not specifically cancel the charter."

We think that is what has been done here, and that such action was within the power of the trial court, and that the findings of the jury were justified by the evidence produced.

The decision of the trial court is therefore affirmed, and all points and cross-points to the contrary are accordingly overruled.

We have considered appellees' motion to affirm on certificate and the same is hereby overruled.